**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ALEXANDER YERSHOV, individually and on behalf of all others similarly situated,<br><br>       *Plaintiff*,<br><br>  *v.*<br><br>GANNETT SATELLITE INFORMATION NETWORK, INC. d/b/a USA TODAY, a Delaware corporation,<br><br>       *Defendant*. | Case No.: |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Alexander Yershov ("Yershov") brings this Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendant Gannett Satellite Information Network, Inc. d/b/a USA Today ("USA Today") to put an end to its unlawful practice of disclosing its users' sensitive information, and to obtained redress for such conduct. Plaintiff, for his Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

### NATURE OF THE ACTION

1.      Defendant is an international media company that produces a variety of news and entertainment programming. Perhaps best known for its flagship newspaper, *USA Today*, Defendant also offers content to consumers via other mediums, including on mobile devices

(such as Android[1] smartphones) through its proprietary mobile software application, the "USA Today Mobile App" ("USA Today App" or the "App").

2.      Unbeknownst to its users, each time they use the USA Today App to watch news and other video clips, Defendant discloses their personally identifiable information—including a record of every video clip viewed by the user (collectively, "PII")—to unrelated third parties. In addition to demonstrating a brazen disregard for its users' privacy rights, USA Today's actions also violate the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), which prohibits companies from disclosing their customers' video viewing records to third parties without express written consent.

3.      USA Today's violation of the VPPA is particularly flagrant here, as it programmed the USA Today App to submit users' PII to a third party web data analytics company. The business models of such "big data" companies center on the collection of disparate pieces of uniquely identifying information and online behavioral data about individual consumers, which they then compile to form comprehensive profiles about consumers' entire digital lives. These profiles are used for targeted advertising, sold as a commodity to other data brokers, or both.

4.      In an era when the collection and monetization of consumer data proliferates on an unprecedented scale, it's important that companies are held accountable for the exploitation of their users' sensitive information. USA Today chose to disregard Plaintiff's and thousands of other users' statutorily protected privacy rights by releasing their sensitive data in to the

---

[1]      Android is a mobile device operating system developed by Google, Inc. Many smartphones, including certain devices manufactured by HTC Corp., and the Samsung Group, utilize the Android operating system.

marketplace. Accordingly, Plaintiff brings this Complaint against Defendant for its intentional and unlawful disclosure of his PII in violation of the VPPA.

## PARTIES

5.      Plaintiff Alexander Yershov is a natural person and citizen of the Commonwealth of Massachusetts.

6.      Defendant Gannett Satellite Information Network, Inc. is a corporation existing under the laws of the State of Delaware with its principal place of business located at 7950 Jones Branch Drive, McLean, Virginia 22108. Defendant is registered to conduct business with the Secretary of the Commonwealth of Massachusetts as entity number 061032273. Defendant conducts business throughout this District, the Commonwealth of Massachusetts, and the United States.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as this action arises under the VPPA, which is a federal statute. This Court has personal jurisdiction over Defendant because it is registered to, and regularly does, conduct business in this District, including entering into transactions with consumers in this District. Further, this Court has personal jurisdiction over Defendant because the unlawful conduct alleged in this Complaint occurred in, was directed to, and/or emanated from this District.

8.      Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in, was directed to, and/or emanated from this District. 28 U.S.C. § 1391(b)(2). Venue is additionally proper because Plaintiff resides within this District, and Defendant is registered to, and regularly does, conduct business in this District, including entering into transactions with consumers in this District.

## FACTUAL BACKGROUND

**I.     USA Today Programmed its App to Transmit Users' PII, Including Video Viewing Activity, to a Third Party Analytics Company Without Their Consent.**

9.     The USA Today App is a mobile software application that allows consumers to access news and entertainment media content on their Android mobile devices.[2]

10.     To install the application on an Android device, users must visit the Google Play Store, the online digital media platform operated by Google. Once downloaded and installed, and upon opening the application for the first time, the USA Today App presents a screen that asks the user's permission for the App to push (*i.e.*, display) notifications on their device. (*See* Figure 1 below, showing the USA Today App when first opened.) After choosing "Yes" or "No," the user is directed to the App's main user interface. (*See id.*)



(**Fig. 1.**)

11.     At no time during this process, however, does USA Today seek or obtain the consent of the user to share or otherwise disclose his or her PII to third parties for any purpose.

---

2     *USA Today*, Google Play, https://play.google.com/store/apps/details?id=com.usatoday. android.news&hl=en (last visited July 2, 2014).

**A.    The USA Today App sends its users' video viewing activity and uniquely identifying PII to third-party data analytics company Adobe.**

12.    As shown in <u>Figure 2</u> below, the USA Today App is organized into categories accessible through the application's main user interface. (*See* <u>Figure 1</u> above; *see also* <u>Figure 2</u> below, showing the App's list of news categories.) Users may browse these sections to view news and entertainment-related articles or view video clips. (*See id.*)



(**Fig. 2.**)

13.    Unbeknownst to its users, however, each time they view video clips, the USA Today App sends a record of the transaction—along with the user's GPS coordinates and other identifiers associated with the user's device, such as its unique Android ID[3]—to an unrelated third party data analytics company, Adobe.[4]

---

[3]    The Android ID is a "64-bit number (as a hex string) that is randomly generated when the user first sets up the device and should remain constant for the lifetime of the user's device." *Settings.Secure*, Android Developers, http://developer.android.com/reference/android/ provider/Settings.Secure.html#ANDROID_ID last visited July 15, 2014).

[4]    Adobe is a company that offers data analytics and online marketing services that it claims "allow [its] customers to create groundbreaking digital content, deploy it across media and devices, measure and optimize it over time, and achieve greater business success." *See Adobe | Company*, http://www.adobe.com/company.html?promoid=JZPLK (last visited July 23, 2014).

**II.    Data Analytics Companies Rely on Unique Identifiers Associated with Mobile Devices to Create Digital Dossiers on Consumers and Their Online Behaviors.**

14.    Today's average consumer uses more than one device to access the Internet to do things like view digital content or make online purchases. This creates challenges for online advertisers and data analytics companies. Namely, to gain a broad understanding of a given consumer's behavior across all of the devices and applications that an individual uses, these companies have to find ways to "link" their digital personas. The primary solution has been to use unique identifiers to connect the dots.

15.    Unique identifiers are used to precisely identify a person and to link their activities across devices and applications. Data analytics companies—like Adobe—create user profiles comprised of behavioral data and unique identifiers, often supplied by hardware manufacturers.

16.    An example of a hardware manufacturer supplied unique identifier in the consumer electronics context is a device's Android ID. That's because Android IDs are "persistent unique identifiers," meaning they are unique to a specific device and user.

17.    Indeed, even "[w]hen a device has multiple users [] each user appears as a completely separate device, so the ANDROID_ID value is unique to each user."[5] These properties make the Android ID a particularly attractive identifier for analytics companies, because it can be precisely linked to an individual person, and the person cannot avoid being tracked while using the device.

18.    For these reasons, Adobe uses device identifiers such as the Android ID to

---

Using its services, Adobe says, helps companies "make, manage, measure, and monetize their content across every channel and screen." *Id.*

[5]    *Settings.Secure | Android Developers*, http://developer.android.com/reference/android/provider/Settings.Secure.html#ANDROID_ID (last visited July 15, 2014).

identify and track specific users across multiple electronic devices, applications, and services.

   **A.    Adobe and other data analytics companies maintain massive digital dossiers on consumers.**

   19.    USA Today partnered with Adobe because its analytics services provide insights into the behaviors and demographics for the App's user base. This helps USA Today to, among other things, accurately target advertisements to its users.

   20.    The reason Adobe (or any other analytics company) is capable of developing a complete understanding of an individual's digital activities is because it collects an enormous amount of detailed information about a given consumer's online behavior (as well as unique identifiers associated with a user's devices) from a variety of sources.

   21.    For instance, an Android app that transmits its host device's Android ID along with a record of user activity provides analytics companies with an intimate look at the different types of materials consumed by the individual. This data may reveal, or help create inferences about, the person's political or religious affiliations, sexuality, or general reading and viewing preferences.

   22.    Once Adobe links a device's Android ID with its owner, it can then connect new information retrieved from Android apps—including the USA Today App—with existing data in the person's profile (which was previously collected by Adobe from other sources).

   23.    The following exchange is from an interview with Adobe's senior product manager, Christopher Comstock, where he confirms the company's ability to identify users across devices:

   **Q:** What are your clients requesting when it comes to cross-device matching?

   **Mr. Comstock:** This applies to advertisers and publishers. They're asking us first to be able to identify when they have a known customer ID. They want that ID to be the linking mechanism across different devices. From an AudienceManager standpoint, we can do that and tie those different device profiles to be a common

user profile.[6]

24.      Later in the interview, Mr. Comstock discusses the collection of data from mobile

and other devices:

> **Q:** Can you go into that? What are the different elements of cross-device your
> clients are talking about?

> **Mr. Comstock:** For us, it's browser-to-browser or browser-to-app.
> Understanding those relationships. Work vs. home computers, understanding the
> behavior across those different devices. Mobile is the current trend but as we add
> Internet-connected TVs, Roku devices and with Comcast and Freewheel, the
> digital world is all over the place and it needs to extend beyond mobile, and have
> a platform able to bring in and capture devices in general.

25.      Likewise, the Privacy Policy for Adobe's analytics services states that: "[s]ome

companies using Adobe services may send us information that allows them to identify you

personally. Some companies may also buy additional information about you and then add that

additional information to the information collected by Adobe's products on their websites. This

additional information may include things like email addresses, account information, or

Facebook profile information, including photos and usernames."[7]

26.      But this is only the tip of the iceberg. An excerpt from Adobe's marketing

materials, shown in <u>Figure 3</u> on the following page, portrays the vast array of information that

feeds into a consumer's digital profile in Adobe's databases using information transmitted from

sources like the USA Today App.

---

[6]      *The Cross-Device Question: Adobe*, http://www.adexchanger.com/data-exchanges/the-cross-device-question-adobe/ (last visited June 4, 2014).

[7]      *Analytics and on-site personalization services*, http://www.adobe.com/content/dotcom/en/privacy/analytics.html (last visited July 23, 2014).

| Types of Customer Data | Characteristics | Source |
|---|---|---|
| One-to-One Data | | Single Marketing View of Customer |
| Scoring Attributes | Lifetime value, RFM, risk score, | Customer Data Warehouse/Business Analytics |
| Implicit Customer Data (Behavioral Information) | Navigation history, opens, clicks, online transactions, other (POS, loyalty card activity...) | Web Analytics, Email, Mobile |
| Explicit Customer Data | Areas of interest, favorite products... | Form Capture, Landing Pages, Website |
| Computed Data | Estimated age, type of home... | Customer Data Warehouse/Business Analytics |
| Sociodemographic Data | Age, category, household structure, income | CRM, Third-Party Data Augmentation |
| Contact Information | Name, first name, address, email, phone number (home, business, or cell) | CRM |

(**Fig. 3.**)

27.   Figure 3 details the depth of information captured by Adobe's data analytics services. Of particular note are the "source[s]" of consumer data in the far right column. The graphic's references to these sources—including "Web Analytics" and "Mobile"—implicate mobile software applications (like the USA Today App) that collect consumer data. These sources help Adobe generate profiles on individuals containing the wealth of information shown in the middle column of Figure 3. That information includes things like a person's address, age, phone number, email, purchase history, behavioral activity, and income.

28.   Mr. Comstock also commented on Adobe's wealth of data in his interview, where he stated that, "[Adobe] has as much if not more data as the other [data-management] players in the space, and for us it's just taking those data elements and building a privacy-centric view of combining device data, looking at those data points and figuring out who may be the user across numerous devices, when we don't know who they are."[8]

---

[8]     *See The Cross-Device Question: Adobe*, *supra* note 6.

29.     Accordingly, in this context Adobe uses data obtained from the USA Today App, among other sources, to personally identify users and associate their video viewing selections with a personalized profile in its databases.

**B.     The President and Congress are responding to growing privacy concerns over the collection and misuse of personal information in the digital marketplace.**

30.     Concerns over the privacy risks associated with the collection and transmission of PII from digital devices to third parties is no longer just academic musing. In a recently issued sixty-two page policy memo, President Obama squarely addressed the issue, stating that there's a growing problem with consumers' privacy "in the age of the Internet, the World Wide Web and smartphones."[9] While the President's memo provided a "blueprint" for protecting consumers' privacy, he called on Congress to take the lead and pass legislation to curb behavior related to the corporate exploitation of user data.

31.     For its part, Congress has started to take up these issues as well. In 2011, Senators Patrick Leahy and Al Franken established the United States Senate Committee on the Judiciary, Subcommittee on Privacy, Technology, and the Law that, among other things, oversees the laws and policies governing (i) the collection, protection, use and dissemination of commercial information by the private sector, including online behavioral advertising, privacy within social networking websites and other online privacy issues, (ii) privacy standards for the collection, retention, use and dissemination of personally identifiable commercial information, and (iii)

---

[9]     *Consumer Data Privacy In a Networked World: A Framework for Protecting Privacy and Promoting Innovation in the Global Digital Economy*, http://www.whitehouse.gov/sites/default/files/privacy-final.pdf (last visited July 23, 2014).

privacy implications of new or emerging technologies.[10]

32.     In establishing this Subcommittee, Senator and Subcommittee Chair Al Franken

noted that "[t]he boom of new technologies over the last several years has made it easier to keep

in touch with family, organize a community and start a business . . . It has also put an

unprecedented amount of personal information into the hands of large companies that are

unknown and unaccountable to the American people."[11]

33.     Members of other subcommittees have made similar remarks. In a meeting of the

Subcommittee on Consumer Protection, Product Safety, and Insurance, Senator John Rockefeller

noted that, "third parties use [consumer data] to target advertising on individuals . . . It is very

good business, but it is very cynical. It is an abuse of that power, passing on people's profiles."[12]

34.     In response to the increased scrutiny on consumers' privacy concerns, companies

are also starting to change their data collection and usage practices. For instance, in the release of

Apple's most recent mobile device operating system, iOS 7, Apple discontinued the ability to

transmit certain personally identifiable information to third parties for tracking purposes.[13]

35.     Despite the controversy surrounding these methods of harvesting and

commodifying sensitive consumer data, USA Today chose to disclose its users' sensitive

---

[10]     *United States Senate Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law*, http://www.judiciary.senate.gov/about/subcommittees#privacy (last visited July 23, 2014).

[11]     *Sen. Franken To Chair New Subcommittee on Privacy, Technology and the Law*, http://www.franken.senate.gov/?p=hot_topic&id=1315 (last visited July 23, 2014).

[12]     S. Hrg. 112-289, Consumer Privacy and Protection in the Mobile Marketplace, http://www.gpo.gov/fdsys/pkg/CHRG-112shrg73133/html/CHRG-112shrg73133.htm (last visited July 23, 2014).

[13]     *iOS 7 Eliminates MAC Address as Tracking Option, Signaling Final Push Towards Apple's Own Ad Identifier Technology*, http://techcrunch.com/2013/06/14/ios-7-eliminates-mac-address-as-tracking-option-signaling-final-push-towards-apples-own-ad-identifier-technology/ (last visited July 23, 2014).

information to the third party data analytics company Adobe.

**III.    The VPPA's Importance in the Digital Age.**

36.    When the VPPA was introduced, the late Senator Paul Simon noted that, "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes. These records are a window into our loves, likes, and dislikes." S. Rep. No. 100-599 at 7–8 (1988). Senator Patrick Leahy, one of the original drafters of the VPPA, also remarked that, "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." *Id.* at 8.

37.    While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern computing era is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized this point, saying that, "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[14]

38.    Likewise, Senator Al Franken summed up the importance of the VPPA in today's world as follows: "[i]f someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what

---

[14]    *The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law*, http://www.judiciary. senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited July 23, 2014).

they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."[15]

## IV.    **Plaintiff Yershov's Experience with the USA Today App.**

39.    Starting in late 2013, Yershov downloaded and began using the USA Today App on his Android device to read news articles and watch video clips.

40.    At all times relevant, Yershov never consented, agreed, or otherwise permitted USA Today to disclose his PII to third parties.

41.    Likewise, Yershov has never been given the opportunity to prevent the USA Today App from disclosing his PII to third parties.

42.    Nevertheless, each time Yershov viewed a video clip using the USA Today App, USA Today disclosed his PII—in the form of the title of the videos he had watched, his unique Android ID, and his GPS coordinates—to third party analytics company Adobe. Using this information, Adobe was able to identify Yershov and attribute his video viewing records to an individualized profile of Plaintiff Yershov in its databases.

## CLASS ALLEGATIONS

43.    **Class Definition**: Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All persons in the United States who used the USA Today App to watch videos and had their PII transmitted to Adobe.

Excluded from the Class are (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entity's current and former employees, officers, and directors, (2) the Judge to whom this

---

[15]    *Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century,* frank.senate.gov (Jan. 31, 2012), https://www.frank.senate.gov/?p=hot_topic&id=1923.

case is assigned and the Judge's immediate family, (3) persons who execute and file a timely

request for exclusion from the Class, (4) persons who had their claims in this matter finally

adjudicated and/or otherwise released, and (5) the legal representatives, successors, and assigns

of any such excluded person.

44.     **Numerosity**: The exact number of members of the Class is unknown and is not

available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class

likely consists of thousands of individuals. Class members can be easily identified through

Defendant's records.

45.     **Commonality and Predominance**: There are many questions of law and fact

common to the claims of Plaintiff and the other members of the Class, and those questions

predominate over any questions that may affect individual members of the Class. Common

questions for the Class include but are not limited to the following:

a)      Whether Defendant, through the USA Today App, unlawfully disclosed

and continues to unlawfully disclose its users' PII, including their video

viewing records, in violation of the VPPA;

b)      Whether Defendant's disclosures were committed knowingly;

c)      Whether Defendant disclosed Plaintiff's and the Class members' PII

without consent; and

d)      Whether Defendant violated Plaintiff's and the Class members' rights to

privacy.

46.     **Typicality**: Plaintiff's claims are typical of the claims of the other members of the

Class. Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful

conduct during transactions with Plaintiff and the Class.

47.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other members of the Class.

48.     **Policies Generally Applicable to the Class**: This case is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. The factual and legal bases of Defendant's liability to Plaintiff and to the other members of the Class are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the members of the Class have suffered harm and damages as a result of Defendant's unlawful and wrongful conduct.

49.     **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Class are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendant's actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Class to obtain effective relief from Defendant. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to

all parties and the Court and require duplicative consideration of the legal and factual issues

presented herein. By contrast, a class action presents far fewer management difficulties and

provides the benefits of single adjudication, economy of scale, and comprehensive supervision

by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of

decisions will be ensured.

50.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class

Definition" based on facts learned through additional investigation and in discovery.

**FIRST CAUSE OF ACTION**
**Violation of the Video Privacy Protection Act**
**(18 U.S.C. § 2710)**
**(On behalf of Plaintiff and the Class)**

51.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

52.     Defendant is a "video tape service provider as defined by the VPPA because it

"engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or

delivery or prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. §

2710(a)(4), inasmuch as it provides video (*i.e.*, "similar audio visual materials" under the

VPPA's definition) to consumers via its USA Today App.

53.     Plaintiff is a "consumer" as defined by the VPPA because he downloaded,

installed, and watched videos using the USA Today App. 18 U.S.C. § 2710(a)(1). Under the

VPPA, this means that he was a "subscriber" of "goods or services from a video tape service

provider." 18 U.S.C. § 2710(a)(1).

54.     While the USA Today App was installed on his Android mobile device, Plaintiff

viewed numerous video clips using the app. On information and belief, during these occasions

the app disclosed Plaintiff's PII—including his device's unique Android ID, GPS coordinates,

and records of the videos that he viewed—to third party analytics company Adobe.

55.     The USA Today App's transmissions of Plaintiff's PII to Adobe constitute "knowing[] disclosures" of Plaintiff's "personally identifiable information" to a person as proscribed by the VPPA. 18 U.S.C. § 2710(a)(1).

56.     Under the VPPA, the term "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). The definition's usage of the word "includes" means that a more expansive reading of the term was expressly contemplated.

57.     As detailed more fully in Section II above, the information disclosed by USA Today—the combination of his device's unique Android ID and the records of the videos that he viewed—constitutes "personally identifiable information" in this context because it allows Adobe to identify users such as Yershov, and to attribute their video viewing records to their Adobe-created profiles.

58.     Consistent with this view, the National Institute of Standards and Technology (NIST) defines "personally identifiable information" as "any information that can be used to distinguish or trace an individual's identity."[16] As described in detail in Section II above and throughout this Complaint, Plaintiff's Android ID and video viewing records can be used by Adobe to distinguish or trace his identity.

59.     The USA Today App's transmissions of Yershov's PII to Adobe constitute "knowing[] disclosures" of Plaintiff's "personally identifiable information" to a person as proscribed by the VPPA. 18 U.S.C. § 2710(a)(1).

---

[16]     Erika McAllister, Tim Grance, Karen Scarfone, *Guide to Protecting the Confidentiality of Personally Identifiable Information*, National Institute of Standards and Technology (April 2010), http://csrc.nist.gov/publications/nistpubs/800-122/sp800-122.pdf.

60.     At no time did Plaintiff ever provide USA Today with any form of consent—either written other otherwise—to disclose his PII to third parties.

61.     Nor were USA Today's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, the USA Today App's disclosures to Adobe (an analytics company) were not necessary for "debt collection activities, order fulfillment, request processing, [or] the transfer of ownership." 18 U.S.C. § 2710(a)(2).

62.     As a result of Defendant's unlawful disclosures, Plaintiff and the Class have had their statutorily defined rights to privacy violated. Plaintiff seeks an injunction to prohibit USA Today from releasing his and the Class's PII in the future, as well as the maximum statutory and punitive damages available under the VPPA. 18 U.S.C. § 2710(c).

<b>PRAYER FOR RELIEF</b>

**WHEREFORE**, Plaintiff Alexander Yershov on behalf of himself and the Class, respectfully requests that this Court enter an order:

A.     Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff Alexander Yershov as representative of the Class, and appointing his counsel as Class Counsel;

B.     Declaring that Defendant's actions, as set out above, violate the VPPA, 18 U.S.C. § 2710;

C.     Awarding injunctive and other equitable relief as necessary to protect the interests of the Class, including, *inter alia*, an order prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

D.     Awarding damages, including statutory damages of $2,500 per violation, and punitive damages, where applicable, in an amount to be determined at trial pursuant to the

VPPA, 18 U.S.C. § 2710(c);

E.      Awarding Plaintiff and the Class their reasonable litigation expenses and

attorneys' fees;

F.      Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent

allowable; and

G.      Awarding such other and further relief as equity and justice may require.

### JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**ALEXANDER YERSHOV**, individually and on
behalf of all others similarly situated,

Dated: July 24, 2014            By:/s/Erica Mirabella
                                    Erica Mirabella

Erica C. Mirabella (#676750)
erica@mirabellallc.com
MIRABELLA LAW LLC
132 Boylston Street, 5th Floor
Boston, Massachusetts 02116
Tel: 617.580.8270
Fax: 617.583.1905

Rafey S. Balabanian*
rbalabanian@edelson.com
Benjamin H. Richman*
brichman@edelson.com
J. Dominick Larry*
nlarry@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Motion for admission *pro hac vice* to be filed.