UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ALEXANDER YERSHOV, )
Individually and on behalf of )
all others similarly situated, ) Civil Action
Plaintiffs )
) No. 14-13112-FDS
)
vs. )
)
)
GANNETT SATELLITE INFORMATION
NETWORK, INC.,
Defendant

BEFORE: THE HONORABLE F. DENNIS SAYLOR, IV

MOTION HEARING/SCHEDULING CONFERENCE

John Joseph Moakley United States Courthouse
Courtroom No. 2
1 Courthouse Way
Boston, MA 02210

July 28, 2016
2:31 p.m.

Valerie A. O'Hara, FCRR, RPR
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

APPEARANCES:

For The Plaintiffs:

Edelson PC, by J. AARON LAWSON, ESQ. And NICK LARRY, ESQ., 350 North LaSalle Street, Suite 1300, Chicago, Illinois 60654;

ERICA MIRABELLA, ESQ., 132 Boylston Street, Boston, Massachusetts 02116;

For the Defendant:

ZwillGen PLLC, by MARC J. ZWILLINGER, ESQ. and JEFFREY LANDIS, ESQ., 1900 M Street NW, Suite 250, Washington D.C. 20036.

Nutter, McClennen & Fish, LLP, by HEATHER B. REPICKY, ATTORNEY, Seaport West, 155 Seaport Boulevard, Boston, Massachusetts 02210-2604.

PROCEEDINGS

THE CLERK: All rise. Thank you. You may be seated. Court is now in session in the matter of Alexander Yershov vs. Gannett Satellite Information Network, Inc., Civil Action 14-13112.

Will counsel please identify themselves for the record.

MR. ZWILLINGER: Good afternoon, your Honor, Marc Zwillinger on behalf of Gannett and joined at counsel table by my colleague, Jeff Landis.

02:31PM

MR. LANDIS: Good afternoon, your Honor.

MS. REPICKY: Heather Repicky from Nutter, McClennen & Fish, your Honor, on behalf of Gannett as well.

THE COURT: Good afternoon.

MR. LAWSON: Good morning, Aaron Lawson on behalf of Alex Yershov and the punitive plaintiff class. I have with me Nick Larry and Erica Mirabella from Erica Mirabella, LLC.

MR. LARRY: Good afternoon, your Honor.

THE COURT: Good afternoon. This is first a hearing on defendant's motion to dismiss. Mr. Zwillinger, it's your motion.

02:31PM

MR. ZWILLINGER: Thank you, your Honor. We are here today even though we've been here before and up to the First Circuit and back on the question of whether the information that was collected by U.S.A. Today app could be

considered personally identifiable, and we were here because we were debating whether Mr. Yershov had adequately pled that he was a subscriber, but what we don't have is any allegation of injury or harm that was a consequence of the alleged disclosure in the case.

The last time I was here, I was very focused on the fact that Gannett, my client, never knew who Mr. Yershov was when they disclosed the information, but what's even more significant now is that Mr. Yershov had no idea and still has 02:32PM no idea whether Adobe ever linked a single video to him, and because he doesn't know that, he hasn't been able to allege anywhere in the complaint that he has suffered any type of harm or consequence from the disclosure because he can't. He didn't even allege that Adobe ever identified him.

What he said in the complaint, and I really want to focus the Court on it, is in paragraph 42, given the nature of the information Adobe had, they were able to, as in had the capacity to identify him, but they didn't say Adobe identified him, and the question for this Court today, which is the same 02:33PM question that the Ninth Circuit has to answer after the remand in *Spokeo* is in this case with this particular plaintiff and these claims, has he adequately demonstrated at this stage through pleadings that he has Article III standing, that he suffered an injury in fact, something that's real, not abstract or conjectural, and our view is that this is not an injury in

fact case, this is an injury in theory case, that is, it's both a case barred by *Spokeo* and *Clapper*.

In *Spokeo*, it's a situation where we don't have any allegation of harm other than the bare statutory violation, and it's a *Clapper* case because it's not enough just to say that Adobe had the capacity to identify him any more than it was enough for the plaintiffs in *Clapper* to say the U.S. government had the capacity to surveil him.

He has to allege that he was actually victimized or injured or harmed by Adobe's conduct, and he didn't do that, he didn't say it. It's just not there in the complaint.

Now, on the *Spokeo* point, both sides have pointed to language in *Spokeo* that supports their argument. They point to the language in *Spokeo* that says Congress has the power to define injuries that will give rise to a case or controversy where none existed before, but the Court was very clear to point out that Congress' role in elevating intangible harm does not mean that they automatically satisfy the injury and fact requirement whenever there's a statutory right and a violation.

Article III standing requires a concrete injury, a concrete actual injury, and what we have here in this complaint is no allegation of an injury to Mr. Yershov, and I ask the Court to focus on the remand in *Spokeo* because in that case, there was an allegation that the failure to follow the statute resulted in incorrect information published online that could

have affected Mr. Robins' job prospects, and the center said that should have been enough to grant standing, and the Court said no, that's not enough. The allegations of the complaint were not enough, remanded it back to the Ninth Circuit to say you must do it and agree as to whether there was concrete harm from the statutory violation.

The allegations here are much weaker than that, your Honor. Yershov didn't claim he was embarrassed even by the fact that his video choices, what news video he watched on the U.S.A. Today app was known to Adobe because he doesn't know that it was known to Adobe.

02:35PM

He couldn't consistent with Rule 11 make an allegation that Adobe had identified him, and so we think this fails as a factual matter under 12(b)(1) -- I'm sorry, we think this fails as a facial matter under 12(b)(1), but even if we get past the facial allegation on standing, it would fail as a factual matter, that is, the Court could authorize limited discovery on the single question of whether Adobe ever identified Mr. Yershov.

02:36PM

He didn't plead that they did, and if they didn't, then there would be no standing in this case, so I invite you to ask plaintiff's counsel when he gets up here why he didn't allege that Adobe identified Mr. Yershov because I don't think he can allege it, and without identifying him, there's no concrete harm.

02:36PM My colleague, Mr. Landis, said to me when we were prepping, what about a peeping tom type case when a peeping tom looks through the window, isn't there just automatically a violation? What are you going to say when the Judge asks you that, and I said the embarrassment or harm from a peeping tom type case only comes if you know that the peeping tom looked through the window, whether you know it then or you know it later, somebody looked through the window, and what I'm saying to the Court is there's no allegation that Adobe looked through the window.

All they said is the neighbor likes to look through windows, the neighbor has a pair of binoculars, he could have looked through the window but not that he did, and that's what I'm trying to focus the Court on today.

THE COURT: Wouldn't a better analogy be that Gannett took a photograph of you, you know, I don't think peeping toms ever look at men, but bear with me here, took a photograph of you, sent it to Adobe, and you don't know whether Adobe ever looked at it, in other words, the photograph has been taken, we 02:37PM just don't know whether or not it's ever been used. Isn't that a better analogy?

MR. ZWILLINGER: I think that's a useful analogy. For their case to work, there's two parts to it though. They allege that Adobe had information from which they could have identified the plaintiff, but not about him, not about

Mr. Yershov.

Adobe generally has information, but for their theory to work, Adobe would have to have information about everybody in the United States, and then everybody who used the U.S.A. Today app would have standing because the information would be disclosed to Adobe, and Adobe would have the capacity to identify everybody, but I don't think that's the way we should look at this case.

He has to allege that the information was given to Adobe, that Adobe already had his information from some other source and that they put the pieces together and identified him, not just the capability, the capacity, they could have figured it out, but that they did.

Normally when you're injured, you know you've been injured, right, you don't get to conduct discovery in federal court to determine if you've been injured. You're injured under the TCPA, you get adjunct facts, you get a text, you get an unwanted call, you know you've got an unwanted call, you know you had injury. Discovery is to figure out what the violation was that led to it perhaps, but you know you've been injured.

Here they're looking for discovery to reveal that they've been injured, and I think that's what they can't do. That's not what federal courts are for, and, again, I would point you back to *Clapper*. If every user of the U.S.A. Today

app had standing, every user of the telephone system in *Clapper* should have had standing because they said the government has the capacity to intercept every phone call. The government can use the 702 program to intercept the communications of U.S. citizens talking to non-U.S. citizens and, therefore, I need to sue the government to figure out if my conversation was surveilled, and the Court in *Clapper* said no, you have to demonstrate before you come into federal court that it was your conversation that was surveilled, and then you can sue the government under 702.

02:39PM So that's my argument, your Honor, we know that *Spokeo* didn't say that all statutory violations automatically create concrete harm. We know that *Spokeo* said the opposite, you have to look at the case, and if this case and this plaintiff and these allegations meet the *Spokeo* standard, it's hard to imagine what would fail. This is a bear violation, and we are not anywhere close to making out Article III standing at this stage in the proceeding.

THE COURT: All right. Mr. Lawson.

02:40PM MR. LAWSON: The right created by the Video Privacy Protection Act is the right not to have personally identifiable information disclosed. My friend has focused us on what the disclosee does with the information, but the statutory violation occurs when the protected information is disclosed. That's the interest created by the statute, that's protected by

the statute, and it's invaded simply by the disclosure, and I would point back to your ruling on the 12(b)(6) motion and to the First Circuit's opinion on appeal.

You noted that anyone who happened to have the Android ID of a particular person could probably find out a lot about them, and that's what made it personally identifiable information. That's the reason the information was protected.

The First Circuit was a little bit narrower. They noted that under our allegations, it was plausible that Adobe 02:41PM had what they called the game program, but it wasn't necessary to their holding that Adobe opens the program and figures out that Number 12 is Tom *Brady* for the information that Gannett has disclosed to be personally identifiable information, so I think the argument you were just presented with moves us a little bit beyond what *Spokeo* and any of the other standing cases really require.

And I'd like to go back to the very beginning of the argument. My friend mentioned, used the word "consequence." This entire argument is about consequential harm, but *Spokeo* is 02:41PM pretty clear that consequential harm is not always required, that there are times when just the harm identified and guarded against by Congress by virtue of the statutory violation is sufficient to confer standing, and this is one of those instances because the VPPA creates a concrete interest.

You know, the *Nickelodeon* Court in the Third Circuit

recognized that. The interest in not having protected information disclosed, that's a real interest. This particular, this alleged statutory violation invades that interest, and, therefore, the invasion of a concrete legally protected interest gives rise to standing under *Spokeo*, under any of the other cases that the Supreme Court has issued.

If the Court has questions, I'm willing to answer them, but in a nutshell, that's my pitch.

THE COURT: I mean, is your argument that the interest 02:42PM here, whatever it is, a privacy interest, an interest in not having private information disclosed for commercial purposes perhaps does not need any consequence at all to constitute an injury? I mean, is that the thrust of it?

MR. LAWSON: Yes, through the VPPA Congress created a concrete interest in the protection of this information, of information about video viewing choices, and whenever there are plausible allegations, as we have here, plausible allegations that that interest has been invaded, that is a -- essentially the invasion of a concrete interest is a concrete injury, 02:43PM that's why we have standing even under *Spokeo*.

THE COURT: All right. And that would require me, I guess, to pick and choose among statutes. Some statutes create rights that are protectable and some do not, is that the basic idea, and how do I choose among them? How do I know which statutes are those kinds and which are not?

MR. LAWSON: Well, I think there are a number of ways. One, you can look at the legislative history. We know from *Havens* that the legislature history is very important to determining what kind of interest Congress is trying to protect.

THE COURT: Well, that case here, it's easy, it's Bob Bourque's videotapes at Blockbuster.

MR. LAWSON: And Senator Leahy's discussion of computers and all of that, so that's one way to look at the 02:44PM interest they were looking to protect. I think you've got to combine that by looking at the claim for relief that is created by the statute to determine, you know, does that line up with what Congress is looking to protect, and I think here *Lujan* here provides an excellent contrast, right, the Endangered Species Act, you can tell from the title they were trying to protect some kind of interest in, you know, endangered species, and the ability to see them, you know, aesthetic issues were at issue in that case, but what the Court called the noninstrumental abstract right to have the government follow 02:44PM the law didn't have any relationship necessarily, the citizenship suit provision didn't have any relationship to the interest protected by the claim discussed in the legislative history there so you couldn't use the citizen's suit provision to get into court.

THE COURT: All right. How do I distinguish this

situation from the Fair Credit Reporting Act at issue in *Spokeo*?

MR. LAWSON: Well, the Court in *Spokeo* didn't actually -- well, I guess there are two ways, and let me just say upfront the Court in *Spokeo* didn't actually say that the allegations there were insufficient. I mean, Footnote 8 says we don't take any position on this, we've given you an indication about zip codes.

We expect the Ninth Circuit to take that indication and run with it on remand, but the Court didn't say anything about what other types of inaccurate information were insufficient to confer standing in that case, but the other way is that, you know, the right at issue in *Spokeo* is definitely procedural. The statute itself uses the word "procedures," and we know from *Lujan*, in footnote 78 of that decision that procedural rights have to be analyzed much differently.

I'm not entirely sure if the Court meant to, you know, in *Lujan*, we were talking about traceability and redressability. I don't know if the Court in *Spokeo* meant to also say that procedural rights are special when we talk about concreteness, but the fact that procedural rights have to be connected to something outside the procedure because the right itself is what we've elsewhere called the procedural right in vacuo. There's a substantive right is directly connected to whatever, almost by definition, directly connected to whatever

the statute is trying to protect.

THE COURT: Okay. Mr. Zwillinger, do you want to respond?

MR. ZWILLINGER: If I could, your Honor. A couple points. First, every statute is going to have an interest. Every federal statute had one. *FCRA* had one. The interest in *FCRA* that Congress was trying to protect, among many, was to make sure that there was publication of accurate information. The information that was published in *Spokeo* was inaccurate. Again, that was not deemed by the Court to be automatically enough for standing.

Second is, as you pointed out, the purpose of VPPA was inspired by the publication, public publication of Judge Bourke's video records, had the records here been disclosed to the public, then the Court might come to a different conclusion, but you have to look at the plaintiff and the theory of the case.

The theory of the case here is that the disclosure was made privately to a service provider, Adobe. Under the statute, service providers are allowed to get disclosures, that is, videotape, VTSPs, which we are not conceding that we are, we want to challenge that, but if we were covered, we're allowed to make disclosures to service providers of specific types, the types that you order fulfillment and debt collection, so we made a disclosure under their theory to the

wrong type of service provider, which we're not at the core interest of what the statute was trying to protect, which was the public disclosure, it allowed service provider disclosures.

But, most importantly, their theory of the case wasn't that we gave information that was identifiable on its face. We had this discussion last time we were here. Their theory of the case is that we gave information that with some diligence and Jiu-Jitsu and comparing to information you got from other sources, Adobe could put the pieces together and identify.

02:48PM That theory of the case doesn't stand on Article III standing on the mere disclosure. That thing has to have happened. They have to have a game program that has Number 12 in it. It's not enough to say they had a game program, Number 12. Mr. Yershov has to be in the game program for this theory to work, which is why I'm saying to the Court that both facially they didn't allege that, that Adobe had Yershov's information and linked him up, and, factually, if you want to have discovery on 12(b)(1) factual standard, Adobe is going to say they didn't do it.

02:48PM And so when we get to the next part of the discussion, the scheduling conference it's why it's so important to us that we say we think this fails, right now it fails *Spokeo*, it should be dismissed, but if you're not going to dismiss, you certainly should have bifurcated discovery or factual inquiry into whether Adobe did this thing because that's what the whole

case turns on, and we shouldn't spend time looking at any other question until we resolve that because I think it's going to come out they didn't do it, but I think right now it should be dismissed because they didn't allege it.

THE COURT: All right. Mr. Lawson, final word.

MR. LAWSON: I'll leave to the 26(f) discussion those points. Let me just make one point about the argument that because the statute allows disclosures in some instances and not others that this isn't the kind of statute that protects an interest that is concrete.

02:49PM

I think there are three problems with that and in no particular order, they are:

1, it leaves Congress to sort of an all or nothing approach. Either you protect everything or you protect nothing. And I don't think anyone thinks Congress doesn't have the ability to take a problem that it sees in the world one step at a time, as sort of the famous saying goes.

2, the entities that receive unlawful disclosures are then redefined as videotape service providers, which means they can't then redisclose in the same way we allege Gannett does, so there aren't nearly as many holes in the statutes as this argument sort of implies.

02:50PM

And, 3, again, it's inconsistent with *Havens*, as I think most of this argument is about standing, most of Gannett's argument is. In *Havens*, right, the interest

protected by Section 804 of the Fair Housing Act was the right to truthful information, but the Court made clear that only untruths that were the product of discriminatory misrepresentations were actually actionable under the statute.

There was a divide between the type of injury that got you into court and the type of injury that you could recover for, and I think there's no way for this theory to account for that.

THE COURT: You know, the problem with the Fair

02:50PM Housing cases, they're kind of unique onto themselves. I mean, you can create your own injury, you can be a tester. I'm not sure there's any other field of law where you can do that, and it's kind of an anomaly that exists I think for historic reasons. I mean, the case law is what it is, but the analogies don't work, I think, to other areas of the law, at least not in my mind.

All right. Here's what I'm going to do. I'm going to take this under advisement. I am not convinced, I guess, that it is sensible to postpone discovery altogether while I sort

02:51PM this out. There is some risk there, obviously, that if I do decide there's not standing that some time and effort will have been wasted, but I think on balance the more prudent thing to do is to let discovery begin, so I'm going to turn to that and put a scheduling order in place.

What is not clear to me there is how far apart you all

really are, I guess, putting aside freezing discovery altogether. Other than class discovery, which itself may not be huge, but I'll put that aside, I mean, we have whatever Mr. Yershov has, which presumably is not much, and then some Gannett and Adobe discovery, and it just doesn't seem to me to be huge.

In other words, I've been requested by Mr. Zwillinger to limit it. What am I limiting it to exactly? What is left over? Again, putting aside damages, if any, and class issues like numerosity and so forth?

Mr. Zwillinger.

MR. ZWILLINGER: Well, one thing that appeared in the scheduling order for the plaintiffs is that they want to conduct discovery about other disclosures that Gannett might have made to other third parties, which was a complete surprise since they didn't allege in the complaint that there was any cause of action based on that, so the things you're limiting to us, the case is about disclosures to Adobe, you're limiting discovery to be discovery into what we gave Adobe and what Adobe did with it.

That seems reasonable, and then it's this question of whether we're a VSP, obviously, we think should be covered. As long as there's no other unrelated third-party discovery, I don't know what else you're limiting, but we'd have to hear from plaintiffs what they're seeking.

THE COURT: And I guess that segues as well into this notion. You know, you say you're not a VTSP, is that the acronym? You could move for summary judgment on that tomorrow. You know, I don't know what discovery is necessary to support that, but I'm going to set a decline, but it's a deadline. It's the last day you can file. Now, you might, of course, get a 56(d) response back and so on, but, again, that it seems to me to be largely an issue of law.

I guess I would be surprised if there were disputed 02:53PM facts in terms of how Gannett goes about its business and what it does, and, you know, either the statute applies or it doesn't.

MR. ZWILLINGER: Well, it certainly would be helpful for guidance and the Court because we do expect a 56(f) response back, and we don't think there would be a lot to cover. I have to tell you, we thought about doing a motion to dismiss, and we were expected we were going to hear that converts into summary judgment, so we've held off, but the question of whether we are a VSP only goes to what types of 02:54PM videos were available to Mr. Yershov through the app when he used it, you know, with U.S.A. Today. We have news clips generally in advertising, so we don't think that would be very complicated. If we can get rid of any plaintiff's objections to the scope of discovery on that, then we could proceed quickly to summary judgment.

THE COURT: I don't think I'm going to -- I'm just trying to get a handle on it generally without making actual discovery rulings because it's all quite abstract to me.

Mr. Lawson, do you want to respond?

MR. LAWSON: I'm going to let Mr. Larry handle this portion of the argument here.

MR. LARRY: Thank you, your Honor. I'll address a couple points. I think you hit the nail on the head with the point that the issues raised for limited discovery by defendant

02:54PM cover most, possibly not all, but the obvious categories for discovery, and our problem with the schedule proposed by defendant is two-fold.

One is given that that is the overwhelming majority of at least the merits-based rather than class-based discovery we'd be seeking, it seems like an artificial distinction that will, if anything, only cause us to come back to the Court to resolve a discovery dispute over whether something falls within the scope or not, and from our perspective, the far more efficient way to deal with things would be if there is a

02:55PM borderline issue to just take discovery on that rather than having further briefing coming back before your Honor.

The second issue we have with the schedule proposed by defendant is that it's incredibly short. We're going to be seeking discovery some from the defendant on the VPS issue, which as you outlined is not extensive, but we're going to be

02:56PM
seeking most of it from Adobe, and that is going to take time because we could be seeking a large volume of information.

We're also seeking what is essentially their secret sauce, and they're not going to turn that over just on receipt of a subpoena. We're going to have to move to compel production. We're only to get some of what we want initially. There's going to be depositions. Three months' turnaround time for that is just not going to work.

The remarkable thing about their schedule is we're sitting here in federal court, they're a proper party to discovery. They're the only defendant in this case, and their position is they want to do discovery on this one issue that, as you said, they can move on summary judgment tomorrow, and they want to push the burden of discovery off onto nonparties and onto the plaintiff to get that information from nonparties, and that's just not consistent with in our view the Federal Rules even as amended to stress the importance of proportionality.

02:57PM
The more efficient way is to just allow everything to go forward, at least as to the merits, we'll avoid having to come back on discovery disputes about whether a request is inside the line or outside, and we can deal with this in nine months and figure everything out.

Even under their schedule, I would be shocked if we were able to get those limited issues, especially the Adobe

issue that they've stressed the importance of under nine months.

One final point just addressing their point about us articulating the need for information about any other disclosures that took place. That's an easily dealt with problem. If the defendant is not disclosing any other Android IDs or similar PIIs through third parties, there's a really easy way for them to respond. There's no responsive documents. They can respond to an interrogatory saying there 02:57PM are no other entities. If they are, in fact, doing that, that's certainly relevant to the claims, which are a violation of the VVPA.

It's not so narrow as to be only a violation of the VVPA under the theory, under the legal theory that it was to Adobe because we're required to plead claims, not legal theories. That's all we've got for now, your Honor.

MR. ZWILLINGER: Your Honor, if I could.

THE COURT: Yes.

MR. ZWILLINGER: I think this illustrates exactly the point I was making about why it's important to phase discovery. I mean, they stood up and they said they want Adobe secret sauce. They don't want to know whether Adobe identified Mr. Yershov, they don't want to know what we gave them, they want Adobe secret sauce, and, of course, that's going to create, you know, lots of discovery fights and arguments from

Adobe as opposed to a limited, targeted discovery question to resolve the issues in the case, and I would just ask in light of what just heard, if you would, maybe you could hold discovery till you issue your ruling on the motion to dismiss but, if not, I would ask that you limit it in Phase I so we can see where we are at that point because I think going into class discovery and going into knowledge and going into other disclosures, asking our witnesses for what they knew about when we don't think Adobe even does this thing I think is going to 02:58PM create a lot of discovery problems, and I think phased discovery is the answer.

THE COURT: All right. Here's how I'm going to handle this. In no particular order, let me make some general observations. The problem with phased discovery, if you're too technical about it is you just wind up triggering a whole new set of disputes about whether it's in Phase I or Phase II or Phase III, and it's one of those things that looks good on a law professor's chalkboard and then you get out there in real life, and it becomes quite complicated.

02:59PM Having said that, there are some things we can put aside for now, and one of those is, again, class discovery. I think we should start with Mr. Yershov's claim and see where that goes, and I don't expect that there will be much in the way of damages discovery, but if there is, we'll put that on hold as well.

Second, in terms of the timing of all this, I'm not going to set a schedule that assumes that there will be massive discovery disputes and this will take forever to resolve. That may well be true, but the problem is the longer a deadline I set, the more -- well, everything always waits until the eleventh hour. Human beings are human beings. If I gave you 30 years to conduct discovery, you would be sending out deposition notices 29 years and 11 months from now, so I'm going to set a timetable that I think sounds about right.

03:00PM I'm going to set it for interim status conferences so I can check in. I let people appear by phone. You don't have to get on airplanes to do this, but I find it helpful in terms of managing the case and seeing, you know, what directions we're going in rather than trying to figure it all out in advance in the abstract.

I do want to focus on the core issues, however that is defined here. I will be highly skeptical of fishing, I guess, into issues that are not presented in the complaint. You know, one never knows how cases unfold, but I don't think that I'm 03:01PM going to start with the assumption that this covers anything other than U.S.A. Today or anything other than Mr. Yershov or any vendor other than Adobe. If it winds up playing out differently, then we can take it a step at a time.

Finally, lawyers have a tendency to conduct discovery in a way that I guess kind of covers their own rear. They want

everything upfront. They're afraid if they don't ask for 110 percent of what they may some day need, they'll be forever precluded. I do not want you to do that. I want you to start with the core issues. I will be much more receptive to an argument that we started small and we discovered X and Y and now we want to explore X and Y in a second wave of discovery as opposed to asking for the entire alphabet upfront and trying to decide that in the abstract.

So it seems to me that it does not seem complicated at 03:02PM all from Mr. Yershov's standpoint in terms of what he has to produce, it doesn't seem very complicated in terms of Gannett, and Adobe, who knows. If Mr. Zwillinger is right and Adobe is not doing what plaintiffs say they are doing, that's simple, and if we have to get into secret sauce, we'll get into it, but let's take it a step at a time.

So, with that, what I'm going to do is this. I'm going to order, and I'll set some dates in a moment, but I'll basically order that discovery may commence after the initial disclosures as to everything except class discovery, damages 03:03PM and experts, in other words, what I'll call core fact discovery on liability.

I'll set it for periodic status conferences, and I suspect that discovery disputes may wind up being referred to the magistrate judge, but I'm prepared to listen to both sides as to general discovery issues, how the case ought to go, and

we'll see how it unfolds. In my experience, when people start producing documents and taking depositions, cases often transform themselves into something else, and I'd rather deal with that as it comes up rather than try to guess it all through now.

And in terms of whether, you know, Gannett is a VTSP, they are free to move for summary judgment at any time or judgment on the pleadings at any time between now and the deadline. If there is a Rule 56(d) response, I'll want you to 03:04PM be targeted, say that you need X, Y and Z to respond to it, not generalized complaints that it's too early.

I express no view on the topic. You know, I found the statute to be written in an odd way, both broader than you might think and sometimes narrower than you might think, and I'll have to match up the discovery requests and the motions and the claims against the statute, so with that, let me walk through some dates. I'll put all this in a written scheduling order.

I'm going to direct that the initial disclosures, to 03:04PM the extent they have not been done so already, shall be completed by August the 11th, 2016. Fact discovery shall conclude on January 13th, 2017, which is about four months or so away, closer to five, I think. Wait, I'm doing my math wrong here.

MR. ZWILLINGER: Four and a half.

THE COURT: Four and a half. In any event, it should be ample unless there are problems, and if there are problems, I'll extend the deadline. I'm going to set it for interim status conferences. Thursday, September 8th at 9:30 a.m. and Friday, October 28th at 9:30 a.m. Again, I permit telephone appearances. Do those dates pose a problem, September 8th and October 28th at 9:30?

MR. ZWILLINGER: One minute, your Honor.

THE COURT: Yes.

03:07PM MR. ZWILLINGER: I have a meeting in New York on September 8th in the morning. It involves about 14 people. It will be difficult to move.

THE COURT: All right. Hold on. How about Friday, September 9th at noon?

MR. ZWILLINGER: Much better, your Honor.

MR. LARRY: Your Honor, unfortunately, a group of people working on this case are going to be in a settlement conference with a magistrate judge at that time. I don't know that we'll be able to commit to breaking out at that point.

03:07PM THE COURT: All right. How about are you free in the afternoon, Mr. Zwillinger, on the 8th? Is it only the morning you're tied up?

MR. ZWILLINGER: Yes, after two.

THE COURT: How about 4:00 on September 8th? Again, this may be short. I want to check in and see how things are

developing. It may be five minutes long.

MR. ZWILLINGER: We can make that work.

THE COURT: I don't require senior counsel to appear, just as long as it's someone who knows what's going on, and, you know, will have authority commensurate with the nature of the conference. If you do want to appear by telephone, make sure we know that, that you've got the dial-in information, the passwords and everything and that we're not looking for you, and I ask that you exercise common sense, particularly don't if 03:08PM you can avoid it, don't put us on speaker, which tends to pick up a lot of background noise, and don't put us on hold with your special hold music.

All right. I will set a deadline, it's not clear to me at this stage whether or not we're going to have expert discovery or how class certification is going to play out. I'm going to put those on hold for the time being. Please feel free to remind me as I speak to you periodically that I'll need to set these deadlines. I want to get fact discovery going now, but I will set a deadline for amendment to the pleadings 03:09PM and for dispositive motions.

The deadline for amendment of the pleadings without leave of court to assert new claims or defenses or to add new parties will be December, the 2nd, after which good cause must be shown, and the deadline for the filing of dispositive motions shall be February 17th, 2017.

I'm prepared to revisit those deadlines as necessary, particularly if we're going to have experts and class certification discovery and so on. I mean, those deadlines may slide considerably.

All right. This will be the initial scheduling order. The dates will be put in a written scheduling order. They will be Court-ordered deadlines, and any party seeking to modify the deadlines should file a motion after consulting with your opponent. I will try to apply a rule of reason. I understand 03:10PM that sometimes deadlines don't work, by their nature, they're artificial. You're busy professionals with lots going in your professional and personal lives, but I do want to be assured that you're moving the case forward.

If we're going to have a knockdown, drag-ut fight with Adobe, let's get started with it, let's not wait until the day before discovery ends, and I express no opinion as to what information from Adobe is discoverable at this point. We'll leave that for another day.

I don't expect to take long on deciding the motion to 03:11PM dismiss. All this, of course, assumes I'm going to deny it. If I grant it, I suppose that's easy and easy from the discovery standpoint. That will cut everything off, but we'll let those chips fall where they may. Again, just to be clear, I am carving out from fact discovery pending further court order class issues and damages issues as well.

MR. ZWILLINGER: Your Honor, could I clear up one thing for the record?

THE COURT: Yes.

MR. ZWILLINGER: If we do move for an early summary judgment motion on the VTPS issue, it would not preclude the filling of a summary judgment motion at the conclusion of discovery on other issues; is that correct?

THE COURT: No. Again, I don't think it's sensible for me as the Judge to try to have some impose some rule you 03:12PM can only move once for summary judgment. I mean, the answer is it depends, okay. Some issues must be resolvable early on, some not.

I will ask that you be merciful upon your opponent and particularly the Court. Don't keep moving on the same issues. At some point, I'll be unhappy with you, but if you think this is a separate severable issue that could be supported by a couple affidavits, maybe the response will be some limited discovery, I'll hear you out, we can have motion practice on that.

03:12PM And for that matter, I welcome anyone who wants to have any kind of case management conference, even on short notice. If you're having trouble deciding what it is I just said or what it means, I would rather talk to you on the phone, call the clerk, we can arrange a conference call. I'd rather work it out that way than have you fight about it and file

motion papers and so forth.

My intent is to keep the case moving and my approach is going to be -- my philosophical approach is going to be like Goldilocks, I don't want too much or too little, okay. I don't want you to ask too much or provide too little, I want core discovery on the core issues to be the immediate focus, and let's start there and see where we go from that point.

That's just precatory language, that's not a ruling on any particular point of law, and to make sure that's obvious, 03:13PM what I want to do right now is focus on Mr. Yershov, U.S.A. Today, Gannett and whatever Adobe did or didn't do with this information.

Okay. All right. Anything else that makes sense? I sometimes will set an interim deadline for service of written discovery. I'm not going to do that except I do suggest that you get your document requests and interrogatories out there if they're going to be disputed, again, to make sure depositions can occur on time and so forth, but at this stage, you know, let's see where, and on September 8th or whatever the deadline 03:14PM I set was I'll want to hear from you how the case is progressing, what you've done, what comes up next, what does the case look like, and at some point are we going to take expert discovery, class discovery, move for class certification, you know, what is all that going to look like.

Okay. Anything else? Mr. Lawson.

MR. LAWSON: No.

THE COURT: Mr. Zwillinger.

MR. ZWILLINGER: Nothing further, your Honor.

THE COURT: Thank you, and have a good rest of the summer, and I will see you or speak to you in September.

THE CLERK: All rise.

(Whereupon, the hearing was adjourned at 3:14 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS ) ss.
CITY OF BOSTON )

I do hereby certify that the foregoing transcript, Pages 1 through 32 inclusive, was recorded by me stenographically at the time and place aforesaid in Civil Action No. 14-13112-FDS, ALEXANDER YERSHOV, Individually and on behalf of all others similarly situated, vs. GANNETT SATELLITE INFORMATION NETWORK, INC., and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

Dated this August 11, 2016.

s/s Valerie A. O'Hara

____________________________

VALERIE A. O'HARA
OFFICIAL COURT REPORTER